COURT OF APPEALS
DECISION
DATED AND FILED

November 5, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP1715**

**STATE OF WISCONSIN**

Cir. Ct. No. 2011CV62

**IN COURT OF APPEALS
DISTRICT III**

JAY LINK,

PLAINTIFF-APPELLANT,

LINK SNACKS GLOBAL, INC.,

PLAINTIFF,

V.

JOHN LINK, TROY LINK, JOHN A. HERMEIER AND
LINK SNACKS, INC.,

DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Washburn County: ROBERT E. EATON, Judge. *Affirmed in part; reversed in part and cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    STARK, P.J.    This appeal is the latest installment in a longstanding intrafamilial dispute between Jay Link; Jay's brother, Troy Link; and their father, John (Jack) Link.[1]  The three Links owned various companies that produced and distributed meat products.  In a prior lawsuit (hereinafter, the 2005 litigation), a jury found that Jack had breached his fiduciary duties to Jay, and Jay had breached his fiduciary duties to Link Snacks, Inc. (Link Snacks).  The circuit court subsequently granted Link Snacks' claim for specific performance of a Buy-Sell Agreement, which permitted Link Snacks to redeem Jay's shares of the corporation at their fair market value.  After the court entered judgment in the 2005 litigation, the parties stipulated to the dissolution of certain other jointly owned companies, including Link Snacks Global, Inc. (Link Global), in which Jay and Troy each held a 50% ownership interest.

¶2    Jay subsequently filed the instant lawsuit, asserting that Jack, Troy, and John Hermeier had each breached their fiduciary duties to him in various ways.[2]  As damages, Jay sought the difference between the fair value and the fair market value of his Link Snacks shares (hereinafter, the fair value claim).[3]  Jay later amended his complaint to assert additional claims against Jack, Troy, and

---

[1] For ease of reading, we refer to members of the Link family by their first names throughout the remainder of this opinion.

[2] According to Jay's second amended complaint in this case, John Hermeier is the chief financial officer of Link Snacks and various related entities, and he also serves as a director of Link Snacks and Link Global.

[3] Properly framed, Jay's "fair value claim" is not actually a distinct claim.  Rather, it is a theory of damages pertaining to his breach of fiduciary duty claim.  *See Northern Air Servs., Inc. v. Link*, 2011 WI 75, ¶¶95, 102, 336 Wis. 2d 1, 804 N.W.2d 458 (hereinafter, *Link I*) (referring to Jay's claim for the difference between the fair value and fair market value of his Link Snacks shares as a "theory of damages relating to his breach of fiduciary duty claims" and a "fiduciary duty damages argument").  We use the terms "fair value claim" and "fair value damages theory" interchangeably throughout this opinion.

Hermeier—both on his own behalf and on behalf of Link Global—alleging that they had acted to devalue Link Global's most profitable subsidiary, Jack Link's Canada Company (Link Canada), in order to decrease the value of Jay's 50% share of Link Global (hereinafter, the corporate misappropriation claims).

¶3    Applying the doctrine of claim preclusion, the circuit court concluded Jay's fair value claim was barred by the final judgment in the 2005 litigation. The court further concluded that Jay lacked standing to bring the corporate misappropriation claims on his own behalf, and that any derivative claim should have been brought on behalf of Link Canada, rather than Link Global. Jay now appeals, arguing the court erred by dismissing his fair value and corporate misappropriation claims. We agree with Jay that the court erred by dismissing his fair value claim because the exception to claim preclusion found in § 26(1)(c) of the Restatement (Second) of Judgments is applicable here, and Jay's fair value claim is not barred by the applicable statute of limitations as argued by Jack, Troy, and Hermeier. We conclude, however, that the court properly dismissed Jay's corporate misappropriation claims. We therefore affirm in part, reverse in part, and remand for further proceedings on Jay's fair value claim.

## BACKGROUND

¶4    Jack began selling meat snacks in Minong, Wisconsin, during the mid-1980s. *Northern Air Servs., Inc. v. Link*, 2011 WI 75, ¶12, 336 Wis. 2d 1, 804 N.W.2d 458 (hereinafter, *Link I*). Jack's sons, Jay and Troy, acquired shares of Jack's business, Link Snacks, in 1995. *Id.* At that time, Jack, Jay, and Troy entered into a Buy-Sell Agreement, which, among other things, granted the corporation "the option to redeem all or a portion" of Jack's, Jay's, or Troy's shares if their employment with Link Snacks was terminated. *Id.*, ¶13. The

3

Buy-Sell Agreement provided that the purchase price for those shares would be their fair market value.[4] *Id.*

¶5 In 2002, serious disagreements arose between Jack and Jay about Link Snacks' operations. *Id.*, ¶14. In 2005, Jay and Link Snacks executed a Departure Memorandum, in which they agreed that Jay would be terminated as an officer and employee of Link Snacks and its affiliates, and the parties would attempt to negotiate an amicable buy-out of his interests in the various Link-related companies. *Id.* Those negotiations proved unsuccessful, however, and as a result, Link Snacks, Jack, Troy, and several other plaintiffs commenced the 2005 litigation against Jay. *Id.*, ¶¶15-16. Among other things, they sought specific performance of the Buy-Sell Agreement and money damages for alleged breaches of Jay's fiduciary duties. *Id.*, ¶16.

¶6 Jay subsequently filed various counterclaims, asserting that Jack and Troy had breached their fiduciary duties to him; that their actions in removing him as an officer and shareholder were tortious; and that Jay was oppressed by Jack's and Troy's tortious actions. *Id.*, ¶17. As a remedy for his oppression claim, Jay sought dissolution of Link Snacks and its affiliates under WIS. STAT. § 180.1430(2)(b) (2005-06).[5] *Link I*, 336 Wis. 2d 1, ¶17. In the alternative, Jay sought to recover the fair value of his Link Snacks shares, as opposed to the fair market value to which he was entitled under the Buy-Sell Agreement. *Id.*,

---

[4] The "fair value" per share of a closely held corporation is calculated by dividing the corporation's net worth by the total number of shares. *Link I*, 336 Wis. 2d 1, ¶13 n.6. The "fair market value," in contrast, is calculated by taking the "fair value" and applying downward adjustments for lack of control (in the case of a minority interest) and lack of marketability. *Id.*

[5] All future references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

4

¶¶17-18. It is undisputed that as of July 31, 2005, the fair value of Jay's Link Snacks shares was $31.8 million, whereas their fair market value was only $19.4 million. *Id.*, ¶17 n.13. Jay claimed he should be allowed to recover the difference between those amounts because it represented "ill-gotten gain associated with Jack's and Troy's wrongful actions." *Id.*, ¶18.

¶7     In February 2008, the circuit court granted summary judgment to Link Snacks, Jack, and Troy on their claim for specific performance of the Buy-Sell Agreement, but only to the extent that the court determined the Buy-Sell Agreement was a valid, enforceable, and unambiguous contract. *Id.*, ¶19. The court left for trial Jay's defense and counterclaim that enforcement of the Buy-Sell Agreement would be oppressive. *Id.*

¶8     The circuit court ultimately conducted a three-phase trial in the 2005 litigation, beginning in May 2008. *Id.*, ¶20. Phase I involved claims that are not relevant to this appeal. *Id.*, ¶20. In Phase II, the court empaneled a jury to resolve the parties' legal claims against each other for money damages. *Id.*, ¶21. The jury concluded that Jack had breached his fiduciary duties to Jay, and that Jay had breached his fiduciary duties to Link Snacks and a related entity. *Id.*, ¶22. Jay believed the proper measure of damages on his breach of fiduciary duty claim was the difference between the fair value and the fair market value of his Link Snacks shares. *Id.*, ¶98. However, the court prevented him from presenting that damages theory to the jury. *Id.*, ¶99. The jury instead awarded Jay $736,000 in compensatory damages, which was approximately one year of Jay's salary when employed by Link Snacks. *Id.*, ¶22 & n.14.

¶9     During Phase III of the trial in the 2005 litigation, the circuit court addressed the parties' equitable claims for specific performance of the Buy-Sell

Agreement and judicial dissolution of the Link companies. *Id.*, ¶27. The court concluded, as a matter of law, that Jay was not oppressed under WIS. STAT. § 180.1430(2)(b) (2005-06). *Link I*, 336 Wis. 2d 1, ¶27. Accordingly, the court denied Jay's claim for judicial dissolution of Link Snacks and granted Link Snacks' motion to compel specific performance of the Buy-Sell Agreement. *Id.* The court ordered Jay to surrender his Link Snacks shares for their appraised fair market value. *Id.* The parties subsequently entered into an agreement for the judicial dissolution of other Link entities, including Link Global.

¶10 On November 14, 2008, Jay filed a notice of appeal from the circuit court's judgment in the 2005 litigation. One week later, on November 21, 2008, Jay filed a motion in the circuit court seeking to "enforce" that judgment and compel the redemption of his Link Snacks shares pursuant to the Buy-Sell Agreement. Jay ultimately surrendered his shares to Link Snacks on June 30, 2009. *Id.*, ¶77.

¶11 In his appeal from the circuit court's judgment in the 2005 litigation, Jay argued the evidence at trial established oppression as a matter of law. *Id.*, ¶28. However, because he no longer owned any shares of Link Snacks, Jay requested only money damages as a remedy for that oppression, rather than judicial dissolution of Link Snacks. *Id.* Jay also argued, among other things, that the circuit court had erred by preventing him from arguing to the jury that the proper measure of damages for his breach of fiduciary duty claim was the difference between the fair value and fair market value of his Link Snacks shares. *Id.*

¶12 This court ultimately issued an order concluding that Jay had voluntarily waived his right to appeal the circuit court's decision preventing him from presenting his fair value damages theory to the jury. *Id.*, ¶31. However, the

supreme court accepted Jay's petition for review of our decision and disagreed with our conclusion in that regard. *Id.*, ¶97. The supreme court therefore remanded the matter to this court "to decide whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy." *Id.*, ¶104. The supreme court also held that once Jay surrendered his Link Snacks shares under the Buy-Sell Agreement, he was no longer a Link Snacks "shareholder" and could not assert a claim for oppression/dissolution under WIS. STAT. § 180.1430(2)(b) (2005-06). *See Link I*, 336 Wis. 2d 1, ¶81.

¶13 On remand, we concluded the circuit court had erred "by determining that a minority shareholder alleging that majority shareholders breached their fiduciary duties in a 'squeeze out' cannot recover the difference between fair value and fair market value for his or her shares where a buyout agreement specifies the latter value." *Northern Air Servs., Inc. v. Link*, No. 2008AP2897, unpublished slip op. ¶2 (WI App Jan. 18, 2012) (hereinafter, *Link II*). We reasoned that a fiduciary is liable for any benefit received as a result of his or her wrongdoing, and the duty of loyalty demands "that a fiduciary be compelled to disgorge any profits received as a result of the breach." *Id.*, ¶17.

¶14 Nonetheless, we concluded the circuit court's error in preventing Jay from presenting his fair value damages theory to the jury was harmless. *Id.*, ¶¶19-20. While we acknowledged that "ill-gotten gains" were a proper measure of damages for Jay's breach of fiduciary duty claim, we noted that neither Jack nor Troy had "received any such benefits before the circuit court proceedings terminated" because Jay had retained his Link Snacks shares throughout the trial and "there had been no sale of the shares at fair market value at the time Jay's case was presented to the jury." *Id.*, ¶20. We also noted that, while the circuit court

7

had concluded before the Phase II jury trial that the Buy-Sell Agreement was enforceable as a general matter, it reserved ruling on whether Jay would be required to sell his shares under that agreement pending consideration of Jay's oppression defense and counterclaim. *Id.*, ¶23. We further observed that one possible remedy for Jay's oppression counterclaim was dissolution, in which case Jay would have remained a shareholder and would have been entitled to a pro rata portion of Link Snacks' net assets. *Id.*, ¶24.

¶15 For all of these reasons, we concluded the sale of Jay's shares under the Buy-Sell Agreement was not "a reasonable certainty" at the time of the jury trial in the 2005 litigation. *Id.* We therefore held that the circuit court's error in preventing Jay from presenting his damages theory to the jury "did not affect Jay's substantial rights." *Id.* Jay petitioned for review of our decision in *Link II*, and the supreme court denied his petition on June 12, 2012.

¶16 Jay commenced the instant lawsuit on December 6, 2010, while his appeal of the circuit court's decision in the 2005 litigation was pending. His original complaint asserted two claims, both in his individual capacity. Count I was later dismissed by the circuit court and is not relevant to the issues raised in this appeal. Count II alleged that Jack, Troy, and Hermeier had breached their fiduciary duties to Jay in various ways. Jay's complaint contained a general request for compensatory and punitive damages but did not specifically allege any entitlement to the difference between the fair value and the fair market value of Jay's Link Snacks shares.

¶17 On February 28, 2013, Jay filed an amended complaint in the instant case specifically alleging that Jack, Troy, and Hermeier had breached their fiduciary duties to Jay by "plotting to squeeze [him] out of the Link Companies"

8

in order to force a sale under the Buy-Sell Agreement so that they could obtain Jay's Link Snacks shares for less than their fair value. Jack, Troy, and Hermeier subsequently moved to dismiss Jay's fair value claim. The circuit court granted their motion, concluding that under the doctrine of claim preclusion, Jay's fair value claim was barred by the final judgment in the 2005 litigation.

¶18 Jay then filed a second amended complaint, which for the first time alleged that Jack, Troy, and Hermeier had breached their fiduciary duties to Jay in connection with the dissolution of Link Global. It is undisputed that Jay and Troy each own 50% of the shares of Link Global. Link Global, in turn, owns 100% of the shares of L.S.I. – Canada Holdings, Inc., which owns 100% of the shares of Link Canada.

¶19 Link Canada is a Nova Scotia corporation that was used to distribute Link Snacks' products in Canada. At all relevant times, Jack, Troy, and Hermeier were officers and directors of both Link Global and Link Canada. In his second amended complaint, Jay alleged that Link Canada had "historically generated the highest revenue of any of Link Global's assets." He further alleged that Jack, Troy, and Hermeier had breached their fiduciary duties to him, in his capacity as a shareholder of Link Global, by failing to pursue business opportunities for Link Canada; by "permitt[ing] Link Snacks to take information and hire away key employees from [Link Canada]"; by manipulating intercompany transactions and financial statements; and by transferring value from Link Canada to themselves or to Link Snacks for less than adequate consideration.

¶20 Jack, Troy, and Hermeier moved for summary judgment on Jay's corporate misappropriation claim. They argued Jay lacked standing to pursue a direct claim for the misappropriation of Link Canada's assets on his own behalf

because his complaint alleged harm primarily to Link Canada, rather than to Jay individually. The circuit court agreed and granted Jack, Troy, and Hermeier summary judgment.

¶21 Jay subsequently wrote to Link Global's receiver, seeking permission "to proceed as a derivative plaintiff on behalf of Link Canada." (Formatting altered.) Jay's letter made no mention of any injury to Link Global and did not request permission to assert any claims on Link Global's behalf. The receiver declined Jay's request for permission to file a derivative claim on behalf of Link Canada.

¶22 Thereafter, Jay sought leave to amend his complaint in the instant case a third time. The circuit court granted his motion, and Jay then filed a third amended complaint asserting a derivative claim on behalf of Link Global. The third amended complaint alleged that Jack, Troy, and Hermeier had breached their fiduciary duties to Link Global and Link Canada by: (1) "[t]aking actions to further the interests of Link Snacks, at the expense of Link Global and Link Canada"; (2) "[a]pproving, authorizing, or otherwise participating in transactions between Link Canada and Link Snacks that were unfair to Link Canada"; and (3) "[c]ausing … the transfer of substantial value from Link Global and Link Canada to Link Snacks, including the transfer of Link Canada's operating assets to Link Snacks for inadequate consideration."

¶23 Jack, Troy, and Hermeier moved to dismiss Jay's third amended complaint, and the circuit court granted their motion. The court concluded the third amended complaint alleged that the defendants had misappropriated assets from Link Canada, which was an injury primarily to Link Canada, rather than to Jay or Link Global. In essence, the court concluded any derivative claim should

have been brought on behalf of Link Canada instead of Link Global. The court therefore held that Jay's third amended complaint failed to state a claim upon which relief could be granted. Jay now appeals, arguing the circuit court erred by dismissing his fair value and corporate misappropriation claims.

## DISCUSSION

### I. Fair value claim

¶24     Jay first contends that the circuit court erred by granting Jack, Troy, and Hermeier's motion to dismiss his fair value claim on the grounds that it was barred by the doctrine of claim preclusion. A motion to dismiss tests the legal sufficiency of the complaint. *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693. We accept the facts alleged in the complaint as true for purposes of our review. *Id.*, ¶18. Whether a complaint states a claim upon which relief can be granted is a question of law that we review independently. *Id.*, ¶17. The application of claim preclusion to a set of facts also presents a question of law for our independent review. *Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995).

¶25     "The doctrine of claim preclusion provides that a final judgment on the merits in one action bars parties from relitigating any claim that arises out of the same relevant facts, transactions, or occurrences." *Kruckenberg v. Harvey*, 2005 WI 43, ¶19, 279 Wis. 2d 520, 694 N.W.2d 879. Stated differently, claim preclusion ordinarily bars the relitigation of all matters that were or could have been litigated in a prior proceeding that resulted in a final judgment on the merits. *Id.* The doctrine has three elements: "(1) identity between the parties or their privies in the prior and present suits; (2) prior litigation [that] resulted in a final

judgment on the merits by a court with jurisdiction; and (3) identity of the causes of action in the two suits." *Id.*, ¶21 (citation omitted).

¶26    We agree with Jack, Troy, and Hermeier that all three of these elements are satisfied in the instant case. First, it is undisputed that all parties relevant to Jay's fair value claim in the instant case—that is, Jay, Jack, Troy, Hermeier, and Link Snacks—were also parties in the 2005 litigation. Second, it is undisputed that the 2005 litigation resulted in a final judgment on the merits by a court with jurisdiction.

¶27    As for the third element of claim preclusion, Wisconsin courts apply the "transactional approach" set forth in the Restatement (Second) of Judgments to determine whether there is an identity between the causes of action in two lawsuits. *Id.*, ¶25. Under the transactional approach, all claims arising out of one transaction or factual situation are treated as being part of a single cause of action and are required to be litigated together. *Parks v. City of Madison*, 171 Wis. 2d 730, 735, 492 N.W.2d 365 (Ct. App. 1992). The aim of the transactional approach "is to see a claim in factual terms and to make a claim coterminous with the transaction, regardless of the claimant's substantive theories or forms of relief, regardless of the primary rights invaded, and regardless of the evidence needed to support the theories or rights." *Kruckenberg*, 279 Wis. 2d 520, ¶26. "The concept of a transaction connotes a common nucleus of operative facts." *Id.*

¶28    Jay's fair value claim in this case is based on the same facts that gave rise to his breach of fiduciary duty claim in the 2005 litigation. In both lawsuits, Jay alleged that Jack, Troy, and Hermeier breached their fiduciary duties to him by plotting to "squeeze him out" of the Link companies in order to acquire his interests in those companies for less than their fair value. *See Link I*, 336

12

Wis. 2d 1, ¶93; ***Link II***, No. 2008AP2897, ¶14. Jay's claims in the two lawsuits are therefore part of a single transaction, in that they arose from a common nucleus of operative facts. *See **Kruckenberg***, 279 Wis. 2d 520, ¶26.

¶29　Although we agree with Jack, Troy, and Hermeier that the three elements of claim preclusion are satisfied in this case, we nevertheless conclude that the circuit court erred by dismissing Jay's fair value claim on claim preclusion grounds. Instead, we agree with Jay that the exception to claim preclusion found in § 26(1)(c) of the Restatement (Second) of Judgments is applicable. That exception provides that the general rule of claim preclusion does not apply when:

> The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief.

RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) (AM. LAW INST. 1982).[6]

¶30　The exception in § 26(1)(c) of the Restatement (Second) of Judgments applies in the instant case because, within the procedural history of the

---

[6] Section 26(1)(c) of the Restatement (Second) of Judgments refers to the inability of a "plaintiff" to rely on a certain theory of the case or seek a certain remedy in the first action. Jay was a defendant and counterclaim plaintiff in the 2005 litigation. However, the Restatement clarifies that "[w]here the defendant interposes a counterclaim on which judgment is rendered in his favor, the rules of merger are applicable to the claim stated in the counterclaim." RESTATEMENT (SECOND) OF JUDGMENTS § 21(1) (AM. LAW INST. 1982). The general rule of merger provides, in relevant part, that when a valid and final personal judgment is rendered in favor of a plaintiff, the plaintiff "cannot thereafter maintain an action on the original claim or any part thereof." ***Id.***, § 18(1). The general rule of merger "is subject to the exception stated in § 26" of the Restatement (Second) of Judgments. ***Id.***, § 18. Thus, the fact that Jay was a defendant and counterclaim plaintiff in the 2005 litigation does not prohibit a conclusion that the exception in § 26(1)(c) is applicable here.

2005 litigation, Jay "was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief" in that litigation due to "limitations on the subject matter jurisdiction" of the circuit court.[7] *See id.* In *Link II*, we essentially concluded that Jay's fair value claim was not ripe for adjudication at the time of the jury trial in the 2005 litigation. Accordingly, as explained in greater detail below, the circuit court in the 2005 litigation lacked competency to exercise its subject matter jurisdiction over the fair value claim.

¶31 In Wisconsin, circuit courts are courts of general jurisdiction and have subject matter jurisdiction over "all matters, civil and criminal, not excepted in the constitution or prohibited by law." *Town of Delafield v. Winkelman*, 2004 WI 17, ¶19, 269 Wis. 2d 109, 675 N.W.2d 470. "Accordingly, a circuit court is never without subject matter jurisdiction." *Village of Trempealeau v. Mikrut*, 2004 WI 79, ¶1, 273 Wis. 2d 76, 681 N.W.2d 190. Nonetheless, a circuit court may lack competency to exercise its subject matter jurisdiction in certain circumstances. *Id.*, ¶2.

¶32 In cases brought under the Uniform Declaratory Judgments Act, WIS. STAT. § 806.04, Wisconsin courts have recognized that circuit courts lack competency to exercise their subject matter jurisdiction over unripe claims. *See, e.g.*, *Olson v. Town of Cottage Grove*, 2008 WI 51, ¶¶28, 32, 309 Wis. 2d 365, 749 N.W.2d 211; *Dieck v. Unified Sch. Dist. of Antigo, Langlade, Marathon & Shawano Ctys.*, 157 Wis. 2d 134, 138, 458 N.W.2d 565 (Ct. App. 1990), *aff'd*,

---

[7] Wisconsin appellate courts have previously relied upon the exception to claim preclusion found in § 26(1)(c) of the Restatement (Second) of Judgments in *Hanlon v. Town of Milton*, 2000 WI 61, ¶17, 235 Wis. 2d 597, 612 N.W.2d 44, and *Aldrich v. LIRC*, 2008 WI App 63, ¶10, 310 Wis. 2d 796, 751 N.W.2d 866.

165 Wis. 2d 458, 477 N.W.2d 613 (1991); *Sipl v. Sentry Indem. Co.*, 146 Wis. 2d 459, 464, 431 N.W.2d 685 (Ct. App. 1988).[8] Wisconsin cases treating ripeness as a prerequisite to either subject matter jurisdiction or a court's competency to exercise its subject matter jurisdiction appear to be limited to the declaratory judgment context. However, a number of cases from other states refer more generally to ripeness as a jurisdictional requirement, without limiting that proposition to cases involving declaratory judgments.

¶33    For instance, the Hawaii Supreme Court has stated it is "axiomatic that ripeness is an issue of subject matter jurisdiction." *Kapuwai v. City & Cty. of Honolulu, Dep't of Parks & Recreation*, 211 P.3d 750, 756 (Haw. 2009). The Alabama Supreme Court has similarly stated that ripeness "implicates subject-matter jurisdiction." *Pontius v. State Farm Mut. Auto. Ins. Co.*, 915 So. 2d 557, 562 (Ala. 2005). Appellate courts in multiple other states have also characterized ripeness as general prerequisite to a court's exercise of its subject matter jurisdiction. *See, e.g.*, *Mangiafico v. Town of Farmington*, 163 A.3d 631, 639 (Conn. App. Ct. 2017) ("The issue of ripeness implicates the court's subject matter jurisdiction."); *Thomas ex rel. Thomas v. Murphy*, 918 N.E.2d 656, 663 (Ind. Ct. App. 2009) ("Included within subject matter jurisdiction is whether a claim is ripe for review."); *Kansas Nat'l Educ. Ass'n v. State*, 387 P.3d 795, 802 (Kan. 2017) ("[R]ipeness, like standing, is an element of subject matter jurisdiction."); *Agoglia v. Benepe*, 84 A.D.3d 1072, 1076 (N.Y. App. Div. 2011) ("[R]ipeness is a matter

---

[8] The cases cited in ¶32 refer to ripeness as a jurisdictional prerequisite in declaratory judgment cases. More recently, however, this court has interpreted those cases as "saying that a court lacks the competency to exercise its subject matter jurisdiction" over an unripe claim. *See Soo Line R.R. Co. v. Admiral Ins. Co.*, No. 2012AP1422, unpublished slip op. ¶29 (WI App May 29, 2014).

pertaining to subject matter jurisdiction."); ***City of Houston v. Mack***, 312 S.W.3d 855, 861 (Tex. Ct. App. 2009) ("Ripeness is a threshold issue that implicates subject matter jurisdiction.").

¶34     The cases cited above indicate that when a claim is not ripe for judicial determination, a court may not exercise its subject matter jurisdiction over that claim.  Ripeness, in turn, depends on whether the claim rests on contingent future events that may not occur as anticipated, or may not occur at all.  ***Texas v. United States***, 523 U.S. 296, 300 (1998).  Stated differently, "[c]laims based on future or hypothetical facts are not ripe for judicial determination."  ***Clark v. Mudge***, 229 Wis. 2d 44, 50, 599 N.W.2d 67 (Ct. App. 1999).

¶35     In ***Link II***, we essentially concluded that Jay's fair value claim was not ripe at the time of the jury trial in the 2005 litigation because it was based on contingent future events that might not occur as anticipated, or might not occur at all.  *See* ***Texas***, 523 U.S. at 300; *see also* ***Link II***, No. 2008AP2897, ¶¶20-24.  We reasoned that Jay had not yet sold his Link Snacks shares at the time of the jury trial in the 2005 case, and, as a result, neither Jack nor Troy had yet received the "ill-gotten gains" represented by the difference between the fair value and the fair market value of Jay's Link Snacks shares.  ***Link II***, No. 2008AP2897, ¶20.  We also noted that the circuit court had not yet ruled at the time of the jury trial on whether Jay would ultimately be required to sell his shares under the Buy-Sell Agreement.  *Id.*, ¶23.  We further observed that Jay's oppression counterclaim remained pending at the time of the jury trial, and one possible remedy for that counterclaim was dissolution.  *Id.*, ¶24.  If the circuit court in the 2005 litigation had ordered the dissolution of Link Snacks, Jay would have remained a Link Snacks shareholder and would have been entitled to a pro rata portion of the corporation's net assets.  *Id.*

16

¶36 For these reasons, we concluded the sale of Jay's shares under the Buy-Sell Agreement was not "a reasonable certainty" at the time of the jury trial in the 2005 litigation. *Id.* This conclusion led to our holding that, although the circuit court had erred by preventing Jay from presenting his fair value damages theory to the jury, the error was harmless, in that it "did not affect Jay's substantial rights." *Id.*, ¶¶19-20, 24. In other words, the error was harmless because Jay's claim was based on "future or hypothetical facts" and was therefore unripe. *See Clark*, 229 Wis. 2d at 50.

¶37 Given our holding in *Link II*, we agree with Jay that the exception to the general rule of claim preclusion found in § 26(1)(c) of the Restatement (Second) of Judgments is applicable here. If Jay's fair value claim was not ripe at the time of the jury trial in the 2005 litigation, then the circuit court lacked competency to exercise its subject matter jurisdiction over the fair value claim at that time.

¶38 Jack, Troy, and Hermeier nevertheless argue that the exception to claim preclusion in § 26(1)(c) is inapplicable because Jay's inability to pursue his fair value claim in the 2005 litigation resulted not from the fact that the claim was unripe, but from Jay's own "strategic choices." They contend Jay made the strategic choice to retain his Link Snacks shares throughout the jury trial in the 2005 litigation, which allowed him to "simultaneously assert fiduciary-duty and oppression/dissolution claims." They assert that choice "did not ultimately pay off for Jay," as the circuit court concluded he was not oppressed and ordered him to sell his shares for their fair market value under the Buy-Sell Agreement. Jack, Troy, and Hermeier further note that after the court entered its final judgment in the 2005 litigation ordering Jay to sell his shares, Jay himself moved to enforce the judgment and compel Link Snacks to buy his shares, rather than moving to stay

17

the judgment pending appeal. As our supreme court concluded in *Link I*, that decision was fatal to Jay's oppression claim, because once Jay sold his Link Snacks shares he was no longer a "shareholder" for purposes of WIS. STAT. § 180.1430(2)(b) (2005-06). *See Link I*, 336 Wis. 2d 1, ¶81.

¶39     Jack, Troy, and Hermeier ably explain why Jay's strategic choices in the 2005 litigation ultimately doomed his oppression claim. In this case, however, Jay is seeking to recover fair value damages as a remedy for the defendants' breaches of their fiduciary duties—which was and is a separate and distinct claim. Jack, Troy, and Hermeier concede that "[f]rom 2005 onward, there has never been a time when Jay was not pursuing the fair value claim in a judicial proceeding." He attempted to present his fair value damages theory to the jury in the 2005 litigation based upon the defendants' breaches of their fiduciary duties, but the circuit court prevented him from doing so. *See id.*, ¶99. Jay then appealed, arguing he should have been allowed to present his fair value damages theory to the jury, but we held he had voluntarily waived his right to raise that argument on appeal. *Id.*, ¶31. Jay petitioned for review of our decision, and the supreme court reversed our conclusion regarding waiver and remanded for us "to decide whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy." *Id.*, ¶¶97, 104. On remand, we agreed with Jay that the circuit court had erred by preventing him from presenting his fair value damages theory to the jury. *Link II*, No. 2008AP2897, ¶18. Nevertheless, we determined that error was harmless because the sale of Jay's shares under the Buy-Sell Agreement was not a "reasonable certainty" at the time of the jury trial in the 2005 litigation. *Id.*, ¶¶19-24.

¶40     As the above summary demonstrates, there was never a time during the 2005 litigation and subsequent appeals when Jay was not attempting to pursue his fair value claim based upon the defendants' breaches of their fiduciary duties to him.  His inability to do so was caused not by his own "strategic choices," but by a series of adverse court decisions, specifically:  (1) the circuit court's erroneous decision in the 2005 litigation that Jay was not entitled to present his fair value damages theory to the jury; (2) our erroneous conclusion on appeal that Jay had waived his right to challenge the circuit court's decision; and (3) our decision on remand from the supreme court in *Link II* that even though the circuit court had erred, the error was harmless.  But for those decisions—two of which were ultimately reversed—Jay would have been able to present his fair value damages theory to the jury in the 2005 case.

¶41     Ultimately, our decision in *Link II* that Jay was not entitled to a new trial at which he could present his fair value damages theory to the jury was based on our determination, in essence, that his fair value claim was unripe at the time of the jury trial in the 2005 litigation.  Based on that holding, we now conclude that the circuit court was not competent at the time of the jury trial in the 2005 litigation to exercise its subject matter jurisdiction over Jay's fair value claim.  Accordingly, the exception to claim preclusion in § 26(1)(c) of the Restatement (Second) of Judgments is applicable, and the circuit court therefore erred by concluding that claim preclusion prevents Jay from asserting his fair value claim in the instant case.

¶42     Jack, Troy, and Hermeier argue that even if claim preclusion does not bar Jay's fair value claim, the circuit court's decision to dismiss that claim can be affirmed on alternative grounds.  First, they contend Jay's fair value claim is barred by the applicable statute of limitations.  Whether the statute of limitations

has run on a particular claim is a question of law that we review independently. *Cianciola, LLP v. Milwaukee Metro. Sewerage Dist.*, 2011 WI App 35, ¶19, 331 Wis. 2d 740, 796 N.W.2d 806.[9]

¶43　　Breach of fiduciary duty is an intentional tort subject to the limitations period contained in WIS. STAT. § 893.57. *See Krier v. Vilione*, 2009 WI 45, ¶58, 317 Wis. 2d 288, 766 N.W.2d 517; *Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶¶38-40, 291 Wis. 2d 426, 718 N.W.2d 51. Section 893.57 was amended in 2010 to provide a three-year statute of limitations for intentional torts. *See* 2009 Wis. Act 120, § 1. However, that amendment first applies to injuries occurring on the effective date of the amending act—i.e., February 26, 2010. *See* 2009 Wis. Act 120, § 2; *see also* WIS. STAT. § 991.11 (stating that, unless otherwise specified, the effective date of an act is the day after its date of publication). Here, the parties agree that the injury alleged in Jay's fair value claim occurred before February 26, 2010. Thus, the two-year limitations period set forth in the pre-2010 version of § 893.57 applies to Jay's fair value claim. *See* § 893.57 (2007-08).

¶44　　Jack, Troy, and Hermeier argue that Jay's fair value claim accrued on August 4, 2005, the date Jay was allegedly forced out of Link Snacks. They

---

[9] Jack, Troy, and Hermeier raised a statute of limitations argument in the circuit court as an alternative basis to dismiss Jay's fair value claim. However, based on the court's written decision on the motion to dismiss, it is somewhat unclear whether the court agreed that the fair value claim was untimely. The court initially stated—with little preceding analysis—that "[t]o the extent [Jay] seeks a new trial for events occurring before the trial in [the 2005 litigation], the action is barred by the statute of limitations." The court later addressed the statute of limitations issue in greater detail and concluded "[t]he statute of limitations is not a bar to [Jay's] claim." Yet, on the final page of its written decision, the court again stated Jay's fair value claim was "barred by the statute of limitations." This inconsistency is ultimately immaterial, given our de novo standard of review. *See Cianciola, LLP v. Milwaukee Metro. Sewerage Dist.*, 2011 WI App 35, ¶19, 331 Wis. 2d 740, 796 N.W.2d 806.

note Jay's original complaint in this case was not filed until December 6, 2010, "long past the two … year limitations period that would apply to his [fair value] claim." Jay, in contrast, argues the two-year statute of limitations did not begin running until June 30, 2009, the date Jay sold his shares under the Buy-Sell Agreement. Jay therefore asserts that his original complaint in this case was timely filed.

¶45 "It is well settled that a cause of action accrues when there exists a claim capable of enforcement, a suitable party against whom it may be enforced, and a party with a present right to enforce it." *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 315, 533 N.W.2d 780 (1995). "A party has a present right to enforce a claim when the plaintiff has suffered actual damage, defined as harm that has already occurred or is reasonably certain to occur in the future." *Id.* In *Link II*, we expressly held that at the time of the jury trial in the 2005 litigation, Jay's fair value damages were not reasonably certain to occur in the future because Jay still owned his shares of Link Snacks and "might never have been subject to a buyout at fair market value." *Link II*, No. 2008AP2897, ¶¶22-24. That holding compels a conclusion that Jay's fair value claim had not yet accrued at the time of the jury trial in the 2005 litigation, which took place in 2008. We therefore reject Jack, Troy, and Hermeier's assertion that the fair value claim accrued at the even earlier date of August 4, 2005.

¶46 We instead agree with Jay that the fair value claim accrued on June 30, 2009—the date he sold his shares under the Buy-Sell Agreement. As of that date, Jay had suffered actual damages, in that he had sold his shares for their fair market value, rather than receiving their higher fair value. The date of the sale was therefore the first date when Jay had a "present right to enforce" the fair value

claim, and, as such, the fair value claim accrued on that date. *See **Pritzlaff***, 194 Wis. 2d at 315.

¶47 Jack, Troy, and Hermeier argue that even if Jay's fair value claim accrued on June 30, 2009, it is nevertheless untimely. They contend Jay's original complaint in the instant lawsuit did not specifically assert a fair value claim. Instead, they contend that claim was first alleged in Jay's first amended complaint, which was filed on February 28, 2013—more than three years after June 30, 2009.

¶48 We agree with Jay that the fair value claim asserted in his first amended complaint was timely because it related back to the date his original complaint was filed—i.e., December 6, 2010. A claim asserted in an amended pleading "relates back to the date of the filing of the original pleading" if the claim "arose out of the transaction, occurrence, or event set forth or attempted to be set forth in the original pleading." WIS. STAT. § 802.09(3).

¶49 Here, Jay's original complaint alleged that Jack, Troy, and Hermeier had breached their fiduciary duties to him "by, among other things, … depriv[ing] Jay of monies and dividends owed to him as a shareholder" and acting to "minimize monies properly payable to Jay Link or to minimize the value of Jay's interests in the Link Companies." Those general allegations encompassed Jay's fair value claim, which was then more specifically alleged in Jay's first amended complaint. As a result, the fair value claim arose out of the same "transaction, occurrence, or event set forth or attempted to be set forth" in Jay's original complaint and therefore related back to the date the original complaint was filed. As noted above, Jay's original complaint was filed on December 6, 2010, which was less than two years after the fair value claim accrued on June 30, 2009. Accordingly, the fair value claim was timely filed.

¶50    Moreover, even assuming that Jay's fair value claim accrued on August 4, 2005—as Jack, Troy, and Hermeier contend—we conclude Jay timely asserted that claim in this case because the statute of limitations was tolled during the 2005 litigation. Jay initially asserted his fair value claim as a counterclaim in the 2005 case. WISCONSIN STAT. § 893.14 provides, in relevant part:

> Unless otherwise specifically prescribed by law, the period within which a cause of action may be used as a defense or counterclaim is computed from the time of the accrual of the cause of action until the time that the plaintiff commences the action in which the defense or counterclaim is made. *A law limiting the time for commencement of an action is tolled by the assertion of the defense or the commencement of the counterclaim until final disposition of the defense or counterclaim.*

(Emphasis added.)

¶51    Under the plain language of WIS. STAT. § 893.14, the statute of limitations for Jay's fair value claim was tolled beginning on November 7, 2005—the date Jay filed his counterclaims in the 2005 litigation. At that point, three months and three days had elapsed since our assumed accrual date of August 4, 2005. Pursuant to § 893.14, the two-year statute of limitations on Jay's fair value claim was then "tolled" until the final disposition of Jay's counterclaim—that is, until "the end of the period within which an order for rehearing can be made in the highest appellate court to which an appeal is taken." *See* WIS. STAT. § 893.13(1). We issued our decision in *Link II* on January 18, 2012. The period of time during which we could reconsider our decision ended on March 18, 2012—thirty days after Jay filed his petition for review. *See* WIS. STAT. RULE 809.24(3). The statute of limitations on Jay's fair value claim was therefore tolled from November 7, 2005, until March 18, 2012.

¶52    As noted above, Jay filed his original complaint in this case on December 6, 2010.[10]   At that point, the statute of limitations on the fair value claim remained tolled, for the reasons explained in the previous paragraph.   As such, even assuming that the fair value claim accrued on August 4, 2005, Jay nevertheless timely filed that claim within the applicable two-year statute of limitations.

¶53    Jack, Troy, and Hermeier alternatively argue that Jay's fair value claim was properly dismissed because the sale of Jay's Link Snacks shares "took place as a result of a court order that Jay himself moved to enforce."   They therefore contend the forced sale "could not be a fiduciary-duty breach" because "[c]ompliance with a court order is simply not tortious."   However, the breach alleged by Jay's fair value claim was not the forced sale.   Rather, Jay alleged the defendants breached their fiduciary duties to him much earlier by "plotting to squeeze [him] out of the Link Companies in order to acquire his interest in the Link Companies at less than their fair value."   The forced sale was merely the injury that resulted from that breach.   Under these circumstances, the fact that the forced sale ultimately occurred pursuant to a court order is immaterial.

¶54    Finally, Jack, Troy, and Hermeier argue Jay cannot prevail on his fair value claim because the circuit court in the 2005 litigation ultimately rejected Jay's oppression claim, and its ruling in that regard "survived the subsequent appellate proceedings, making it now beyond challenge."   They therefore contend that Jay's bad acts have been "established beyond dispute," and it was Jay's

---

[10]  Again, even accepting Jack, Troy, and Hermeier's assertion that the original complaint did not adequately assert the fair value claim, we conclude the fair value claim stated in Jay's first amended complaint related back to the date the original complaint was filed. *See supra* ¶¶48-49.

24

"rightful termination … not any fiduciary duty breach … that triggered the Buy-Sell Agreement."

¶55    In making this argument, Jack, Troy, and Hermeier ignore the fact that the jury in the 2005 litigation expressly concluded Jack had breached his fiduciary duties to Jay. *See Link I*, 336 Wis. 2d 1, ¶22. Moreover, neither *Link I* nor *Link II* so much as suggested that the failure of Jay's oppression claim somehow doomed his ability to seek fair value damages as a remedy for his breach of fiduciary duty claim. While we ultimately concluded in *Link II* that the circuit court's erroneous decision regarding Jay's fair value damages theory was harmless, our conclusion in that regard was based on the fact that the forced sale of Jay's stock was not reasonably certain at the time of the jury trial in the 2005 case, not on the fact that the circuit court had ultimately rejected Jay's oppression claim.

¶56    In summary, we conclude that Jay's fair value claim in the instant case is not barred by the doctrine of claim preclusion, based on the exception to claim preclusion found in § 26(1)(c) of the Restatement (Second) of Judgments. We further conclude that Jay's fair value claim was timely filed within the applicable two-year statute of limitations. In addition, we reject Jack, Troy, and Hermeier's alternative arguments that the fair value claim was properly dismissed on its merits. We therefore reverse the circuit court's dismissal of Jay's fair value claim and remand for further proceedings.

## II.  Corporate misappropriation claims

¶57    As noted above, Jay's second amended complaint asserted that Jack, Troy, and Hermeier had breached their fiduciary duties to him in his capacity as a shareholder of Link Global by "enabl[ing] Link Snacks to acquire the most

consistently profitable Link Global asset [i.e., Link Canada] without paying Link Global for it." The circuit court granted Jack, Troy, and Hermeier summary judgment, concluding Jay lacked standing to pursue a direct claim for the misappropriation of Link Canada's assets on his own behalf.

¶58 We review a grant of summary judgment independently, using the same methodology as the circuit court. *Krier*, 317 Wis. 2d 288, ¶14. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). In the first step of the summary judgment analysis, we examine the pleadings to determine whether claims have been stated and a material factual issue is presented. *Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App. 1983). Here, Jack, Troy, and Hermeier argue the facts alleged in Jay's second amended complaint do not establish that Jay has standing to assert a corporate misappropriation claim directly, in his capacity as a shareholder of Link Global. Whether a party has standing presents a question of law for our independent review. *Krier*, 317 Wis. 2d 288, ¶14.

¶59 Directors of a corporation owe fiduciary duties to the corporation's shareholders, as well as to the corporation itself. *Rose v. Schantz*, 56 Wis. 2d 222, 228, 201 N.W.2d 593 (1972). "Thus, where some individual right of a stockholder is being impaired by the improper acts of a director, the stockholder can bring a direct suit on his own behalf because it is his individual right that is being violated." *Id.* at 228-29. However, "[r]ights of action accruing to a corporation belong to the corporation, and an action at law or in equity[] cannot be maintained" by an individual shareholder to enforce those rights. *Id.* at 229 (citation omitted). In those circumstances, an individual shareholder may bring only a derivative action—that is, an action in which "the claims belong to the

corporation, not to the complaining shareholder," and the shareholder proceeds "on behalf of the corporation that has been unwilling to bring the suit." ***Einhorn v. Culea***, 2000 WI 65, ¶16, 235 Wis. 2d 646, 612 N.W.2d 78.

¶60 When determining whether a shareholder may assert a direct claim, as opposed to a derivative claim, the salient inquiry is "[w]hose right is sought to be enforced." ***Rose***, 56 Wis. 2d at 229. "[W]here the injury to the corporation is the primary injury and any injury to a shareholder is secondary, the shareholder may not bring a direct action, and is instead limited to commencing a derivative action." ***Park Bank v. Westburg***, 2013 WI 57, ¶43, 348 Wis. 2d 409, 832 N.W.2d 539. The fact that an injury to the corporation may have a subsequent effect on the value of individual shareholders' shares is not enough to create a right to bring a direct action, rather than a derivative action. ***Rose***, 56 Wis. 2d at 229. "Where the injury to the corporation is the primary injury, and any injury to stockholders secondary, it is the derivative action alone that can be brought and maintained." ***Id.***

¶61 Here, the primary injury alleged in Jay's second amended complaint was to Link Canada, not to Jay individually. As noted above, the second amended complaint alleged that Jack, Troy, and Hermeier breached their fiduciary duties by failing to pursue business opportunities for Link Canada; by "permitt[ing] Link Snacks to take information and hire away key employees from [Link Canada]"; by manipulating intercompany transactions and financial statements; and by transferring value from Link Canada to themselves or to Link Snacks for less than adequate consideration. In essence, the second amended complaint alleged that Jack, Troy, and Hermeier had improperly acted to decrease Link Canada's value. That injury was primarily to Link Canada. Any effect on Jay—who is the shareholder of a separate corporation, which owns a third corporation, which in

turn owns 100% of Link Canada's shares—was, at best, only secondary. Again, the mere fact that an injury to a corporation affects the value of a shareholder's shares is insufficient to give the shareholder standing to bring a direct action, rather than a derivative action. *Id.*

¶62 Moreover, it is not dispositive that Jack, Troy, and Hermeier may have personally benefited from the bad acts alleged in Jay's second amended complaint. Alleged self-dealing by a corporate director does not transform an action that primarily injures the corporation into one that primarily injures a shareholder. *Notz v. Everett Smith Grp., Ltd.*, 2009 WI 30, ¶22, 316 Wis. 2d 640, 764 N.W.2d 904. In *Notz*, for instance, our supreme court concluded a minority shareholder could not assert a direct claim against a majority shareholder and the corporation's directors based on allegations that the defendants had "render[ed the corporation] incapable of continuing in [the plastics] business" so that they could engage in a competing business. *Id.*, ¶28. Despite the defendants' alleged self-dealing, our supreme court held that the resultant injury was still "primarily to the corporation." *Id.*[11]

¶63 Consistent with the foregoing, this court has previously held that "[a]n injury due to a director's action is primarily an injury to an individual

---

[11] Jay argues *Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, 316 Wis. 2d 640, 764 N.W.2d 904, actually supports his position because the minority shareholder in that case was permitted to maintain a separate direct claim that alleged the majority shareholder had improperly received the sole benefit of a corporate due diligence expenditure. *See id.*, ¶¶27-28. The complaint in *Notz*, however, alleged that the due diligence expenditure was essentially a "dividend-like" payment that was improperly paid only for the benefit of the majority shareholder. *Id.*, ¶27. Thus, the complaint alleged that the minority shareholder's rights were affected in a manner distinct from the effect upon the other shareholders. *Id.* Here, in contrast, the conduct alleged in Jay's second amended complaint affected all shareholders of Link Canada equally. *See infra* ¶63.

shareholder if it affects a shareholder's rights in a manner distinct from the effect upon other shareholders." *Jorgensen v. Water Works, Inc.*, 2001 WI App 135, ¶16, 246 Wis. 2d 614, 630 N.W.2d 230. In *Jorgensen*, an S-corporation stopped making certain payments to minority shareholders, but it continued making those payments to other shareholders. *Id.*, ¶¶2-4. Under those circumstances, the minority shareholders were allowed to bring a direct action against the corporation's directors because they had alleged an injury distinct from that suffered by the other shareholders. *Id.*, ¶¶1, 18. Conversely, the injury alleged in Jay's second amended complaint—i.e., the devaluation of Link Canada—had the same effect on both of Link Global's shareholders. This fact further demonstrates that the injury was primarily to Link Canada, rather to Jay individually.[12]

¶64 After the circuit court granted Jack, Troy, and Hermeier summary judgment on the corporate misappropriation claim alleged in Jay's second amended complaint, Jay was permitted to file a third amended complaint, which purported to assert a derivative claim on behalf of Link Global. The circuit court granted Jack, Troy, and Hermeier's motion to dismiss the third amended complaint, concluding it alleged an injury primarily to Link Canada and therefore

---

[12] Jay also relies on *Yates v. Holt-Smith*, 2009 WI App 79, 319 Wis. 2d 756, 768 N.W.2d 213, to support his claim that the conduct alleged in his second amended complaint primarily injured him, rather than Link Canada. However, the plaintiff in *Yates* alleged a classic minority oppression claim—i.e., that the defendant had attempted to force the plaintiff to sell her shares by withholding payment of a year-end bonus. *Id.*, ¶¶1-2. It was undisputed in *Yates* that the plaintiff could bring a direct claim based on that conduct, and the defendant made no argument that the plaintiff could assert only a derivative claim. *See id.*, ¶¶12, 14, 21.

failed to state a derivative claim on behalf of Link Global. We agree with the court's conclusion in that regard.[13]

¶65 In a derivative action, a shareholder stands in the shoes of the corporation. 13 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5947 (rev. ed. Sept. 2018). "The shareholder cannot bring a derivative proceeding unless there is a meritorious cause of action that could be enforced by the corporation." *Id.* In other words, one precondition for a shareholder's derivative claim is "a valid claim on which the corporation could have sued." *Ross v. Bernhard*, 396 U.S. 531, 534 (1970).

¶66 Thus, in order to assert a derivative claim on behalf of Link Global, Jay's third amended complaint needed to allege a valid claim on which Link Global could have sued. However, as the circuit court correctly concluded, the primary injury alleged in Jay's third amended complaint was to Link Canada. Like the second amended complaint, the third amended complaint alleged that Jack, Troy, and Hermeier had improperly decreased Link Canada's value in various ways. Because the third amended complaint alleged an injury primarily to Link Canada, Link Global would not have been able to bring a direct claim against Jack, Troy, and Hermeier based on the allegations in that complaint. A corporation does not have standing to sue for injuries inflicted upon a subsidiary, even though their businesses are intertwined and the success of one is dependent upon the success of the other. *Krier*, 317 Wis. 2d 288, ¶27. Because Link Global could not have asserted a valid claim based on the allegations in Jay's third

---

[13] Again, we independently review a circuit court's ruling on a motion to dismiss for failure to state a claim. *See Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶17, 356 Wis. 2d 665, 849 N.W.2d 693.

amended complaint, Jay could not assert a derivative claim on Link Global's behalf based on those allegations.

¶67 Jay argues this analysis is flawed because it fails to acknowledge that his third amended complaint alleged Jack, Troy, and Hermeier breached their fiduciary duties *to Link Global* by improperly acting to decrease the value of Link Global's asset, Link Canada. Ultimately, however, Jay's argument fails to come to grips with the fact that Link Canada—the entity primarily injured by the defendants' alleged conduct—is a separate and distinct corporation from Link Global. The parties, including Jay, deliberately set up a corporate structure in which Link Canada—as a subsidiary of a subsidiary of Link Global—was a wholly independent entity from Link Global for corporate purposes. It is undisputed that the parties effectuated this corporate structure in order to "isolate [Link Global] and prevent a situation where a liability of one subsidiary would be imputed to [Link Global] and take down the whole structure." We agree with Jack, Troy, and Hermeier that "having set up Link Canada as a separate … company to enjoy certain advantages of doing business as a distinct legal entity," Jay is "bound by the disadvantages of forming separate corporations, including that Link Global has no standing to assert a direct claim to recover for the injuries of Link Canada."

¶68 For all of the foregoing reasons, we agree with the circuit court that the proper means to seek redress for the injuries alleged in Jay's second and third amended complaints would have been either a direct action by Link Canada or a derivative action filed on its behalf. It is undisputed that Link Canada is a Nova Scotia corporation. "In any derivative proceeding in the right of a foreign corporation, the matters covered by ss. 180.0741, 180.0742 and 180.0744 [i.e., derivative standing] shall be governed by the laws of the jurisdiction of

incorporation of the foreign corporation." WIS. STAT. § 180.0747. The parties agree that Nova Scotia law requires a shareholder to obtain leave of the Supreme Court of Nova Scotia in order to bring a derivative action on a corporation's behalf. The parties further agree that Jay has not obtained permission from that court to bring a derivative action on behalf of Link Canada. Under these circumstances, the circuit court properly dismissed the corporate misappropriation claims alleged in Jay's second and third amended complaints.

¶69    No WIS. STAT. RULE 809.25(1) costs are awarded to any party.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings.

Not recommended for publication in the official reports.